UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EDWARD HAYES,

       Plaintiff,

  v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

Case No. 1:10-cv-178

Beckwith, J.
Bowman, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff Edward Hayes filed this Social Security appeal in order to challenge the Defendant's findings that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error. (Doc. 6). Pursuant to local practice, this case has been referred to the undersigned for initial consideration and a report and recommendation. 28 U.S.C. §636(b). As explained below, I conclude that the ALJ's finding of non-disability should be affirmed, because it is supported by substantial evidence in the administrative record.

**I. Summary of Administrative Record**

In July, 2006, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging a disability onset date of February 23, 2006, primarily due to injuries to his legs and resulting pain. Plaintiff also complains of anemia, Type II diabetes, anxiety and depression. (Doc. 4-2 at 55-57). Plaintiff was 37 years old at the time of the ALJ's denial decision, with a nine grade education (special education classes). After Plaintiff's claims were denied initially and upon reconsideration, he requested a hearing *de novo* before an Administrative Law Judge.

On July 29, 2008, an evidentiary hearing was held in Cincinnati, Ohio, at which Plaintiff was represented by counsel. (Doc. 4-2 at 24-72). At the hearing, ALJ Donald A. Becher heard testimony from Plaintiff, from Plaintiff's niece, Darvet Ward, and from Janet Chapman, a vocational expert.

On August 19, 2008, the ALJ entered his decision denying Plaintiff's claims for DIB and SSI benefits. (Doc. 4-2 at 8-19). The Appeals Council denied his request for review. (Doc. 4-2 at 2-4). Therefore, the ALJ's decision stands as the Defendant's final determination.

The ALJ's "Findings," which represent the rationale of the decision, were as follows:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2. The claimant has not engaged in substantial gainful activity since February 23, 2006, the alleged onset date....

3. The claimant has the following severe impairment: pain associated with recently healed bilateral plateau fractures and left femur fracture status post status surgery....
   ……………………..

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

   ………………………

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) because he is limited to standing and/or walking one to two hours per eight-hour workday.
   ………………………..

6. The claimant is unable to perform any past relevant work....

………………………….

7. The claimant was born on August 13, 1968 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(Doc. 4-2, at 13-18). Thus, the ALJ concluded that Plaintiff was not under disability as defined by the Social Security Regulations and was not entitled to either DIB or SSI benefits.

On appeal to this court, Plaintiff maintains that the ALJ erred: 1) by failing to evaluate Plaintiff under Listing 1.02 or 1.06; 2) by failing to develop the record in light of ambiguities as to whether Plaintiff's left femur fracture ever healed; and 3) by improperly assessing Plaintiff's residual functional capacity.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1)

3

performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work;

and finally, at Step 5, if it is established that claimant can no longer perform her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

In this case, Plaintiff alleges that the Commissioner first erred at the third step of the sequential analysis, by failing to find a listed impairment.  To the extent that this Court rejects that assignment of error, Plaintiff additionally argues that the ALJ erred at the fifth step of the analysis by failing to adequately develop the medical record and by improperly evaluating Plaintiff's residual functional capacity.  Plaintiff argues that all three errors, independently or together, require this Court to reverse the Commissioner's decision and award benefits, or in the alternative, to remand for reconsideration under sentence four of 42 U.S.C. §405(g).

Briefly, Plaintiff alleges that he became disabled on March 26, 2006, when he sustained significant injuries, including a left tibeal plateau fracture, a right tibial plateau fracture, and a left femur fracture, in a non-work-related accident during which he

5

became pinned between either a wall and a car or two cars.[1] (Doc. 4-7 at 10). Following the accident, he was taken to the hospital, underwent several surgeries requiring two periods of hospitalization in March and April of 2006, and was eventually discharged to Ivy Woods Nursing Home for rehabilitation. (*Id.* at 22-23). Following his discharge from the nursing home on April 3, 2007, Plaintiff went to live with relatives. (Doc. 4-8 at 4).

### B. The ALJ's Failure to Find Plaintiff Disabled Under Listing 1.02 and/or Listing 1.06

In Plaintiff's first assignment of error, he argues that the ALJ erred by failing to consider whether Plaintiff's injuries meet the criteria under Listing 1.02A and/or Listing 1.06. Plaintiff contends that he meets the criteria for a presumptive award of benefits under either of these two referenced Listings based upon the significant injury he sustained to his left femur.

Plaintiff argues that the ALJ mistakenly described the Plaintiff's left femur as "healed" after surgical manipulation in October of 2006, when in fact medical records showed that Plaintiff continued to have swelling in his left knee, and an x-ray dated August 29, 2007 evidences that the left femur fracture was not healed. (Doc. 4-7 at 203). The ALJ described Plaintiff's left femur as "not well healed until he underwent surgical manipulation in October 2006," (Doc. 4-2 at 14), and stated that it "took several months to heal," (*Id*. at 16), implying that the left femur was fully healed.

Undermining the ALJ's references to Plaintiff's femur being "healed," x-rays dating from June, July, and September, 2006, all reflect a non-union in Plaintiff's left

---

[1] At the hearing, Plaintiff amended his disability onset date from February 23, 2006 to March 26, 2006. (Doc. 4-j2 at 19, 71).

6

femur, stabilized by hardware. (*See* Doc. 4-7 at 42, 44-45, 47).  Of course, it is not entirely clear from the record whether the ALJ's description of Plaintiff's left femur as "healed" translates to a belief that the bone had become "union" as opposed to merely "stabilized."  Nevertheless, Plaintiff argues that because medical records reflect a nonunion in his left femur, the ALJ should have made a presumptive finding of disability.

> Listing 1.02A mandates an award for:
>
> major dysfunction of a joint(s): characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint apace narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A.  Involvement of one major peripheral weight-bearing joint (i.e. hip, knee or ankle, resulting in inability to ambulate effectively.
>
> Listing 1.06 mandates an award of benefits for:
>
> Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones. With:
>
> > A.  Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and
>
> > B.  Inability to ambulate effectively, as defined in 1.000B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

The ALJ did not discuss either of the referenced Listings.  The only Listing that the ALJ discussed specifically was Listing 1.03,[2] although the ALJ also stated generally that "the claimant does not have impairments which meet or equal the requirements of any" Listed impairment. (Doc. 4-2 at 14).

---

[2] Listing 1.03 requires evidence of "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively."

7

There is no question from the medical records that Plaintiff's left femur remained in a "nonunion" state, such as to satisfy part of the definition for the referenced Listings. However, like Listing 1.03, Listings 1.02A and 1.06 *additionally* require a finding that the claimant has an "inability to ambulate effectively."

The "inability to ambulate effectively" is defined under 20 C.F.R., Part 404, Subpart P, Appendix 1, §1.00(B)(2)(b) as:

> (1)...an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning...to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to carry out activities of daily living.....

*Id.*

In this case, any error by the ALJ concerning the level of healing in Plaintiff's left femur and whether the bone was "union" or "nonunion" was harmless, because he did not err by failing to find that Plaintiff's impairments met Listing 1.02A or 106 due to Plaintiff's ability to ambulate effectively. The ALJ specifically determined:

> Effective ambulation was restored to both lower extremities within 12 months of the claimant's surgical procedures and, therefore, does not meet the requirements of listing 1.03. The Disability Determination Services (DDS) determined the claimant's impairment did not meet the criteria of any of the listed impairments. No treating or examining physician has indicated findings equivalent in severity to the criteria of any listed impairment. The undersigned Administrative Law Judge has reviewed the record and finds the claimant does not have impairments which meet or equal the requirements of any [Listing].

(Doc. 4-2 at 14).

8

Substantial evidence supports the ALJ's determination that Plaintiff does not meet the criteria for any listing based upon Plaintiff's failure to prove an "inability to ambulate effectively." Medical evidence demonstrates that Plaintiff was ambulating with a cane within six months of his accident, and independently within seven months of his accident (Doc. 4-7 at 40, 89, 133). In a progress note dated April 1, 2006, Plaintiff reported "relief or tolerability" in his level of pain. (Doc. 4-7 at 137). In subsequent progress notes dated July 19, 2006 and September 1, 2006, Plaintiff reported that he was no longer experiencing any pain from his fractures. (Doc. 4-7 at 43, 74).

Plaintiff was discharged from Ivy Woods Nursing Home in April 2006 with pain medication and no restrictions. (Doc. 4-8 at 3-7, 16). In addition, Plaintiff broke his left forearm in July 2007 after "he was running and he tripped on his stairs," (Doc. 4-7 at 201), which is inconsistent with an inability to ambulate effectively. Although he reported pain in his left femur after he broke his arm, Plaintiff stated that it was not worse upon walking. (*Id.*). Thus, the evidence supports the ALJ's conclusion that Plaintiff did not meet the criteria for any Listed impairment, including Listing 1.02A or Listing 1.06, because Plaintiff did not show an "inability to effectively ambulate" as defined by the regulations. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)(plaintiff bears burden of proof that his impairments meet a particular Listing).

### C. Alleged Failure to Further Develop Medical Record

In a related argument, Plaintiff contends that the ALJ erred by failing to obtain additional evidence concerning Plaintiff's ability to ambulate effectively. Plaintiff asserts that the ALJ should have sought additional medical testimony concerning Plaintiff's left knee injury of July 2007. With respect to that injury, the ALJ cited x-ray results and stated that "there was no instability of the previous distal femur fracture" (Doc. 4-2 at

16). Again Plaintiff argues that the ALJ mischaracterizes the medical evidence in light of an x-ray report that evidences Plaintiff's "ununited distal femur status post ORIF," including "extensive bony callus anteriorly" (Doc. 4-7 at 203). Plaintiff asserts that medical evidence showing a non-union of a major weight bearing joint should have prompted the ALJ to seek out additional medical testimony to determine whether Plaintiff's ability to ambulate was so impaired as to meet a Listing.

Relevant regulations grant an ALJ with discretion to ask for expert evidence. *See* 20 C.F.R. §404.1527(c)(3)(ALJ to obtain additional evidence if he cannot make a determination on the record before him); *see also* §404.1527(f)(2)(iii). However, rarely is an ALJ required to obtain additional medical evidence. On the facts presented, Plaintiff has not demonstrated that there was insufficient evidence in the record for the ALJ to make a determination concerning Plaintiff's ability to ambulate effectively. As discussed, medical notes stated that Plaintiff was able to ambulate without a cane, and the opinions of state agency physicians were in agreement that Plaintiff did not meet or equal any listed impairment (Doc. 4-2 at 14, Doc. 4-3 at 72-75).

### D. Residual Functional Capacity

As his third assignment of error, Plaintiff argues that the ALJ improperly determined his residual functional capacity ("RFC") because he failed to credit all of Plaintiff's own testimony concerning his limitations. For example, Plaintiff claims that the ALJ should have credited Plaintiff's testimony that he needs to shift positions frequently every 15-20 minutes at will when sitting and standing. Plaintiff also testified that he props his feet up 5 hours per day. The vocational expert ("VE") testified that the need to alternate between sitting and standing at will, and/or Plaintiff's need to prop his feet up for several hours per day, would preclude employment. Plaintiff also testified

that in 2007, he had 12 doctor's office visits and 3 x-rays, totaling 15 different days on which he sought medical attention. By contrast, in 2008, Plaintiff had only one doctor's office visit, one ER visit, and one x-ray for a total of 3 days. Plaintiff asserts that this evidence demonstrates that he would need to miss work frequently, precluding employment. Plaintiff testified that he had one unsuccessful work attempt shortly after he was released from the nursing home. (Doc. 4-2 at 33, 43). He testified that his medication negatively impacts his ability to concentrate (*id.* at 48, 57), and that he suffers from panic attacks 2-3 times per week (*id.* at 56).

The ALJ determined that, contrary to Plaintiff's testimony, he retained the residual functional capacity to perform sedentary unskilled work. Based on testimony from the VE, the ALJ found that Plaintiff could perform work as an assembler, tester/inspector, and surveillance monitor. Pursuant to SSR 96-9P, the full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8 hour workday.

The ALJ did not fully credit Plaintiff's description of his limitations because Plaintiff's testimony was contradicted by record evidence. For example, although Plaintiff testified that he was either in a wheelchair or on a walker for ten months (Doc. 4-2 at 57), Plaintiff's own records reflected that he was ambulating with a cane within six months of his accident and independently a month later. (Doc. 4-7 at 40, 89, 133). While Plaintiff claimed depression and anxiety, including multiple panic attacks each week, no medical professional had ever diagnosed any of those conditions and Plaintiff has never sought treatment. No evidence in the record suggests any mental impairment or decreased function (Doc. 4-2 at 14, 17). Plaintiff also provided contradictory information concerning his ability to perform activities of daily living.

11

The ALJ's full explanation of how he determined Plaintiff's RFC in this case is set out in full below:

> The claimant claims that he is unable to work due to pain, joint stiffness, and pain medication side-effects, i.e., difficulty with concentration and focus. He also asserts that he is limited to lifting eight pounds, to standing for 15 minutes at a time, to walking only two blocks, and to sitting for 30 minutes. He further asserts that he has difficulty in bending, and an inability to stoop, kneel or squat (Testimony).
>
> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the residual functional capacity assessment for the reasons explained below.
>
> In terms of the claimant's alleged bilateral leg pain, the objective medical record does indicate that he continues to have some pain and takes medication to lessen the pain. The claimant testified that he has lived alone in a first-floor apartment for the past 10 months; prior residing at a homeless shelter for 90 days; and before that at a nursing home...where he convalesced from his surgery and leg fractures for a period of over one year.
> ....
> At the time of admission to Ivy Woods Care Center, he required assistance with lower extremity dressing, toileting, bathing and transfers.... On May 24, 2006, he was discharged from occupational therapy, at which time he was independent in dressing, grooming, toileting, and bed mobility....He continued to receive physical therapy, as he was not yet independently ambulating and he had poor standing balance....However, by July and August 2006 he was ambulating with a walker without difficulty at a slow and steady pace....By September 5, 2006 he was independent in balance (Exhibit 5F/91) and he ambulated using a cane with a slow steady gait (Exhibit 5F/20). On October 13, 2006, he was "ambulating with no assistance". (Exhibit 5F/64).
>
> In the interim, orthopedic outpatient treatment notes show that on July 19, 2006, he had 5/5 strength in both lower extremities and denied having any pain (Exhibit 3F/8). On his June 30, 2006 orthopedic followup exam, he still had some swelling of the left knee and some quad atrophy bilaterally. He lacked 15 degrees of extension in the right knee and 20 degrees in the left (Exhibit 3F/10). By September 2006, however, he had full extension of the knees bilaterally, with 90 degrees flexion on the right and

12

approximately 60 degrees flexion on the left (Exhibit 3F/6). Moreover, at all times relevant to this decision, he was neurovascularly intact.

Although x-rays show that his left femur fracture took several months to heal...his bilateral tibial plateau fractures had healed satisfactorily within the expected time frame (Exhibit 3F/9). Moreover, his left knee healed well following surgical manipulation in October 2006 (Exhibit 5F/5).

The claimant left the nursing facility on "approved pass" several times in August and September 2006. Nursing home notes from that time period indicate that, although he was still unable to stand for long periods of time, he could be discharged once he found a place to live as he had no residence at that time. He later found a place at a homeless shelter where he was required to help out in the kitchen doing such work as wiping tables. It is also noted that his attempts to work in 2005 and 2007 did not end for impairment-related reasons; the claimant stated that there was no work available through the temporary labor services.

Additionally, at the time of reconsideration in December 2006, he alleged no new illnesses or injuries and no new limitations. Unlike his hearing testimony describing a very limited ability to do any activities of daily living, at the time he filed his request for hearing he reported that he was independent with activities of daily living (bathing, grooming, toileting). He also reported that he ambulated independently, although he preferred to use a cane on occasion.

Moreover, he admitted to an injury to the left wrist in July/August 2007 while "running" up the stairs - an activity seemingly at odds with the level of limitation he asserts (Testimony; Exhibit 7F/3). Around this time he also fell down the stairs, injuring his knee. Thus, x-rays of the left knee done on July 12, 2007 showed a small suprapatellar joint effusion following the fall, but there was no instability of the previous distal femur fracture (Exhibit 7F/11, 14). Since these injuries are unrelated to the initial impairment, they may not be combined with original leg/knee injury to meet the duration requirements of the sequential analysis....

The claimant testified that he relies on his niece to help with the cooking and cleaning. He also relies on his niece to drive him to the grocery store, etc; this, however, is because he has a suspended driver's license. He reports that he otherwise sits and watches television, although he needs to prop his legs on a pillow for about 5 out of 8 hours. He also sleeps with his legs propped up by a pillow. The record, however, fails to reflect the medical need for such.

The claimant's niece, Darvet Ward, testified that she sees the claimant three to four times a week to visit the claimant and do his laundry, household chores, and grocery shopping. She observed that medications

> seem to affect the way the claimant comprehends things.  Ms. Ward's statements are, however, contrary to the record.  Even while the claimant was convalescing from his injuries, notes from the nursing home show he had no significant change in mental status, nor did he exhibit evidence of short or long term memory impairment.  He had no evidence of depression on a Depression Scale utilized by the home.  He could articulate his needs and could establish his own goals in regards to his own care.  He was alert and oriented..., cooperative, cheerful, and motivated to prescribed care (Exhibit 5F).  "Anxiety" is an evaluated area on the nursing home chart.  On the daily charting he always received a "0" for episodes of such behavior (Exhibit 10F/19).  Moreover, he was repeatedly determined to have "no depression" while at the nursing home....There is nothing in the record to show that his mental capacity has declined since his nursing home admission.
>
> As for medical opinion evidence, there is no treating or examining physician assessment with regard to the claimant's ability to do work-related activities.  The undersigned has given the claimant the benefit of doubt in finding that his pain causes limitation on standing/walking and reasonably limits the claimant to performing less than the full range of sedentary work.
>
> In sum, the above residual functional capacity assessment is supported by the record as a whole, especially the nursing home records and treating orthopedic records demonstrating independent and effective ambulation less than 12-consecutive months following his injuries.

(Doc. 4-2 at 15-17).  The ALJ's assessment is supported by the referenced evidence.  Plaintiff does not dispute the fact that he was discharged from the nursing home in April 2007 with no limitations whatsoever.  (Doc. 4-8 at 3-7, 16).

Ordinarily, an ALJ's credibility determination is entitled to substantial deference. *See Sizemore v. Sec. Of Health and Human Services*, 865 F.2d 709, 713 (6th Cir. 1988). The ALJ in this case carefully explained why he discredited Plaintiff's testimony concerning greater limitations than were found by the ALJ to be supported by the record as a whole.  I conclude from a review of the records and testimony that substantial evidence supports the ALJ's RFC assessment.  If an ALJ accurately describes a plaintiff's RFC when formulating a description of limitations to a vocational expert, then

the ALJ's conclusion will be supported by substantial evidence.  *See Varley v. Secretary of Health and Human Serv.,* 820 F.2d 777, 779 (6th Cir. 1987).

### III.  Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED:**

1. That Defendant's decision be found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **BE AFFIRMED**;

2. That this case be **CLOSED.**

                                                  /s Stephanie K. Bowman  
                                                  Stephanie K. Bowman  
                                                  United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EDWARD HAYES,  Case No. 1:10-cv-178

    Plaintiff,  Beckwith, J.
                                                                                  Bowman, M.J.
    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

16